## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

JULIE A. SALAZAR,

       Plaintiff,

v.                                    No. CIV 03-1235 RLP

JO ANNE B. BARNHART,
COMMISSIONER, SOCIAL SECURITY
ADMINISTRATION,

       Defendant.


## MEMORANDUM OPINION AND ORDER

      Plaintiff Julie A. Salazar ("Salazar") invokes this Court's jurisdiction under 42 U.S.C.

§ 405(g), seeking judicial review of a final decision of the Commissioner of Social Security

("Commissioner").  The Commissioner determined that Salazar was not eligible for supplemental

security income benefits ("SSI").  Salazar moves this Court for an order reversing or remanding for

a rehearing.  [Doc. Nos. 11, 12.]

      Salazar was born on December 22, 1967 and was 35 years old when the administrative

hearing was held.  [Tr. at 47, 97.]  She attained a high school degree.  [Tr. at 48.]  She is divorced,

single, and living with her father at this time.  [Tr. at 47.]  Salazar has three children, who do not live

with her.  [Tr. at 47.]  The only job Salazar apparently ever held was at Domino's Pizza in Espanola,

New Mexico for about one year in 1999-2000.  [Tr. at 51-52.]

      On March 21, 2001, Salazar filed for SSI benefits alleging that she could not work because

she was frequently suicidal and had emotional and mental problems, including a bipolar disorder.  [Tr.

at 97, 102.] She stated that she no longer could work at Domino's as of February 15, 2001 because she was on suicide watch. Unfortunately, Salazar has a long history of drug and alcohol abuse, has been hospitalized frequently for self-inflicted wounds and suicidal attempts and has been in jail on numerous occasions for public intoxication.

On February 25, 2003, the Administrative Law Judge ("ALJ") held an administrative hearing, during which Salazar was represented by a non-attorney. [Tr. at 42-79.] At the hearing, the ALJ explained that he would consider all of Salazar's problems, including drug and alcohol abuse, mental health problems, bipolar disorder, depression and whatever else was present. However, the ALJ further stated that if he found drug or alcohol abuse was a material factor that contributed to Salazar's disability, he would have to deny benefits in accordance with the Social Security Act and Regulations. [Tr. at 46.]

On April 13, 2003, the ALJ issued an unfavorable decision, denying Salazar's request for benefits. [Tr. at 21, 24-34.] The ALJ concluded that Salazar's chronic drug and alcohol abuse were material and that without the effects of that abuse, she would not be disabled. He further determined that she retained the residual functional capacity ("RFC") for light exertional level work and could return to her past relevant work as a pizza cook. [Tr. at 32, 55.] Thus, Salazar was not disabled within the meaning of the Social Security Act and Regulations.

On August 29, 2003, the Appeals Council denied Salazar's request for review. [Tr. at 4.] This appeal followed.

2

## Standards for Determining Disability

In determining disability, the Commissioner applies a five-step sequential evaluation process.[1] The burden rests upon the claimant to prove disability throughout the first four steps of this process, and if the claimant is successful in sustaining her burden at each step, the burden then shifts to the Commissioner at step five.  If, at any step in the process, the Commissioner determines that the claimant is or is not disabled, the evaluation ends.[2]

Briefly, the steps are: at step one, claimant must prove she is not currently engaged in substantial gainful activity;[3] at step two, the claimant must prove her impairment is "severe" in that it "significantly limits [her] physical or mental ability to do basic work activities . . . .,"[4] at step three, the Commissioner must conclude the claimant is disabled if she proves that these impairments meet or are medically equivalent to one of the impairments listed at 20 C.F.R. Part 404, Subpart P, App. 1 (1999);[5] and, at step four, the claimant bears the burden of proving she is incapable of meeting the physical and mental demands of her past relevant work.[6]  If the claimant is successful at all four of the preceding steps, the burden shifts to the Commissioner to prove, at step five, that considering claimant's RFC,[7] age, education and past work experience, she is capable of performing other work.[8]

---

[1] 20 C.F.R. § 404.1520(a)-(f) (1999); Williams v. Bowen, 844 F.2d 748, 750 (10th Cir. 1988).

[2] 20 C.F.R. § 404.1520(a)-(f) (1999); Sorenson v. Bowen, 888 F.2d 706, 710 (10th Cir. 1989).

[3] 20 C.F.R. § 404.1520(b) (1999).

[4] 20 C.F.R. § 404.1520(c) (1999).

[5] 20 C.F.R. § 404.1520(d) (1999).  If a claimant's impairment meets certain criteria, that means her impairment is "severe enough to prevent [her] from doing any gainful activity."  20 C.F.R. § 416.925 (1999).

[6] 20 C.F.R. § 404.1520(e) (1999).

[7] One's RFC is "what you can still do despite your limitations."  20 C.F.R. § 404.1545(a).  The Commissioner has established RFC categories based on the physical demands of various types of jobs in the

If the Commissioner proves other work exists which the claimant can perform, the claimant is given the chance to prove she cannot, in fact, perform that work.[9]

The ALJ can meet his burden of proof at step five in two ways: (1) by relying on a vocational expert's testimony; and/or (2) by relying on the "appendix two grids." Taylor v. Callahan, 969 F. Supp. 664, 669 (D. Kan. 1997). For example, expert vocational testimony might be used to demonstrate that the plaintiff can perform other jobs in the economy. Id. at 669-670. Before applying the grids, the ALJ must first find the following: "(1) that the claimant has no significant nonexertional impairment; (2) that the claimant can do the full range of work at a particular residual functional capacity on a daily basis; and (3) that the claimant can perform most of the jobs in that residual functional capacity category." Id. at 669 (relying on Thompson v. Sullivan, 987 F.2d 1482, 1488 (10th Cir. 1993)). Nonexertional limitations can include mental impairments. The grids do not consider nonexertional limitations; therefore, if significant nonexertional limitations are present, the grids may not be applicable. Id. However, the "mere presence of a nonexertional impairment does not preclude reliance on the grids, but the nonexertional impairment must interfere with the ability to work." Id. (internal citations omitted.)

In this case, the ALJ did not reach step five of the sequential process, and instead concluded at step four that Salazar could perform her past relevant work. Thus, the ALJ relied neither on vocational expert testimony nor the grids which are typically used at step five.

national economy. Those categories are: sedentary, light, medium, heavy and very heavy. 20 C.F.R. § 405.1567 (1999).

[8]20 C.F.R. § 404.1520(f) (1999).

[9]Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).

4

## Standard of Review and Allegations of Error

On appeal, the Court considers whether the Commissioner's final decision is supported by substantial evidence, and whether the Commissioner used the correct legal standards. Glenn v. Shalala, 21 F.3d 983, 984 (10th Cir. 1994).  To be substantial, evidence must be relevant and sufficient for a reasonable mind to accept it as adequate to support a conclusion; it must be more than a mere scintilla, but it need not be a preponderance. Trimiar v. Sullivan, 966 F.2d 1326, 1329 (10th Cir. 1992); Muse v. Sullivan, 925 F.2d 785, 789 (5th Cir. 1991).  The Court's review of the Commissioner's determination is limited. Hamilton v. Secretary of Health & Human Servs., 961 F.2d 1495, 1497 (10th Cir. 1992).  The Court's function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision and whether the correct legal standards were applied. Id. at 1497-98.  In Clifton v. Chater, the Tenth Circuit described, for purposes of judicial review, what the record should show:

> The record must demonstrate that the ALJ considered all of the evidence, but an ALJ is not required to discuss every piece of evidence.  Rather, in addition to discussing the evidence supporting his decision, the ALJ must discuss the uncontroverted evidence he chooses not to rely upon, as well as the significantly probative evidence he rejects.

Clifton v. Chater, 79 F.3d 1007, 1009-1010 (10th Cir. 1996) (internal citations omitted).  If supported by substantial evidence, the decision of the Commissioner is conclusive and must be affirmed.  The Court cannot re-weigh the evidence or substitute its judgment for that of the Commissioner. Hargis v. Sullivan, 945 F.2d 1482, 1486 (10th Cir. 1991).

In a thorough and well-reasoned decision, the ALJ made the following findings after careful consideration of the entire record:  (1) Salazar had not engaged in substantial gainful activity since

her protected filing date for benefits; (2) Salazar has an impairment or combination of impairments considered "severe;" (3) in the absence of drug and alcohol abuse, these medically determinable impairments do not meet or medically equal one of the listed impairments; (4) Salazar's allegations regarding her limitations are not well supported by the medical record and are not totally credible; (5) the ALJ carefully considered all of the medical opinions in the record concerning the severity of the impairments; (6) but for the effects of Salazar's chronic polysubstance abuse, she has the residual functional capacity for light exertional level work; (7) Salazar's RFC did not preclude the performance of work-related activities required in her past relevant work as a pizza cook; (8) Salazar's medically determinable impairments did not prevent her from performing her past relevant work, when considered in the absence of drug and alcohol abuse; (9) Salazar's polysubstance abuse is a contributing factor material to the determination of disability; (10) if not for the chronic polysubstance abuse, Salazar would not be disabled; and (11) Salazar was not under a "disability" as defined in the Social Security Act. [Tr. at 33.]

## Summary of Salazar' Work History, Medical Records, and SSI Benefit Application

### A.   Work History

As stated previously, Salazar's only employment was during a one-year period when she worked at Domino's Pizza in Espanola, New Mexico.  Other than that work, Salazar apparently has never held a job, according to the record.

### B.   Medical History

Salazar's medical records primarily span 2000 and 2001, although there are a few later medical records.

**2000**

On January 28, 2000, Salazar was seen at the Health Centers of Northern New Mexico ("Health Centers"). She was assigned a GAF[10] of 46 at this time and stated she had been depressed and cutting herself since the holidays. [Tr. at 203-04.] She was apparently beginning a plan of treatment through the Health Centers but was a no show on February 10, 2000. [Tr. at 202.] On February 20, 2000, Salazar was seen at the Emergency Department ("ER") at St. Vincent's in Santa Fe. She presented there after discharge from Espanola Hospital. She had been maced after an altercation and was being seen at St. Vincent's before going to jail. She was intoxicated at Espanola Hospital and needed sedation. She admitted to drinking and using cocaine. [Tr. at 136.]

A Health Centers record, dated March 1, 2000, indicates that Salazar had just started working part-time at Domino's. She was very depressed but stated she had been doing well until four or five years ago when her son's father and her mother died within nine days of each other. Salazar also gave birth to one of her children shortly after those deaths. She attempted suicide apparently for the first time that year by cutting her wrists, but had made multiple suicide attempts since then by cutting herself or walking into traffic. Her last suicide attempt occurred during the previous week. She had been hospitalized at this time at least five times for suicide attempts. [Tr. at 198.]

A March 12, 2000 emergency mental health evaluation indicates Salazar overdosed on Naltrexone (a medication used to treat alcohol or narcotic dependence), alcohol and cocaine. Police found her walking on a highway in front of cars. Salazar reported she had recurrent bouts of major depression. [Tr. at 190.] She stated that she got drunk and high to kill the pain. [Tr. at 194.] She

---

[10]A GAF score measures an individual's overall level of psychological, social and occupational functioning. DSM-IV, at 32.

signed a suicide prevention plan on March 12, 2000.  [Tr. at 196.]  An Espanola Clinic record shows that Salazar's suicidal ideation were secondary to her alcohol and drug abuse.  [Tr. at 188.]

On March 16, 2000, Salazar's medical compliance had been good for a few days.  Her mood was noted as "fine."  Her affect was full and appropriate.  She had had two to three beers since March 12 and had used cocaine two nights ago.  [Tr. at 185.]  A March 20 record indicates that she was no longer working and slipping back into depression.  The doctor increased the anti-depressant medication, Serzone.  [Tr. at 183.]

On March 20, 2000, Salazar was picked up on a warrant for failure to appear on a traffic violation.  She told the judge she did not appear because of a suicide attempt.  Salazar was concerned that she had missed some doses of her medication.  [Tr. at 177.]  On March 22, she stated she felt dizzy and off balance.  The record notes that Salazar had a history of erratic behavior, including suicidal gestures, often secondary to substance abuse.  [Tr. at 178.]  On March 28, she was a no show at the Health Centers but may still have been in jail.  [Tr. at 176.]

On April 16, 2000, Salazar was seen at Espanola Hospital after she was found crawling down streets at 1 a.m.  The record notes she had chronic severe drug and alcohol problems and marked psychological social problems along with abuse of drugs and alcohol.  [Tr. at 308.]  Another medical record from this period states that Salazar lived on the streets, smoked, drank, used IV drugs, cocaine, heroin or whatever.  [Tr. at 306.]  She was skinny, battered and disheveled.  She had an acute drug and alcohol overdose.  Salazar was admitted to detox by Dr. W. Murray Ryan.  [Tr. at 306.]

On April 20, Salazar again was a no-show at Health Centers.  [Tr. at 175.]  An April 27, 2000 record from Espanola Medical Center indicates that she was in a drug induced delirium, dehydrated,

was dependent on cocaine, intoxicated and depressed.  She had to be sedated after being found in an arroyo.  [Tr. at 268, 269, 275.]  Another record states that Salazar had a long history of psychiatric problems and substance abuse.  She had a history of self destructive behavior.  Her parents said that she had always been depressed.  [Tr. at 287.]  While Salazar had been seen two weeks ago and placed on medication, the doctor did not believe she was taking the medications.  Another Espanola Hospital record, dated April 27, 2000 states that Salazar is a "very unfortunate young woman with borderline personality disorder[11] who also has a strong substance abuse problem."  [Tr. at 290.]  Her parents thought she needed involuntary commitment.

On April 28, 2000, the medical record indicates Salazar was working at Domino's and living with her brother.  She had never been in a drug treatment program but was interested in out-patient programs at Amistad.  [Tr. at 273.]

On May 2, 2000, Dr. Ryan saw Salazar for a follow up from her hospitalization and said she "looked good."  The record noted suicidal attempts and depression.  [Tr. at 320.]

Later in May, Salazar was carried into the Espanola Hospital by police, security and emergency services personnel.  She had hit some of the emergency services personnel.  Salazar was screaming, kicking, swearing, and swinging all of her extremities.  She smelled of alcohol and was restrained.  [Tr. at 262.]  Four days later, Dr. Ryan saw Salazar and said she was doing pretty well.  He gave her samples of Serzone and an anti-anxiety medication, Lorazapam.  Again the medical record documents suicidal attempts and depression.  A later record near this time indicates Salazar

---

[11]Borderline Personality Disorder is an abnormal condition marked by at least five of the following symptoms: (1) impulsiveness in, inter alia, substance abuse; (2) instability of mood, interpersonal relationships and self-image; (3) sieges of depression, irritability and anxiety; (4) lack of anger control and recurrent physical fights; (5) threats of suicide and attempts at self-mutilation; (6) uncertainty about career or long-term goals; and (7) persistent feeling of boredom or emptiness.  2 J.E. Schmidt, Attorneys' Dictionary of Medicine (LexisNexis).

was doing great, according to Dr. Ryan.  She was given more samples of medicine and Dr. Ryan stated that she was "fantastically better."  [Tr. at 319.]

On July 13, 2000, Salazar presented at Health Centers with depression and suicidal ideation. Her most recent GAF was 50.  [Tr. at 174.]  A July 16, 2000 EMS Service Report indicates an alcohol-drug related violent incident or assault.  Salazar was delusional and suicidal.  She was found sitting in the sand in the front yard crying and wearing underwear only.  She was uncooperative, angry, swearing and smelling of alcohol.  She had cactus spines in her and multiple scrapes to her arms and legs.  [Tr. at 254.]  At the hospital, she was restrained.  She reported she had been raped but refused a rape exam.  Salazar was released to police custody for detoxification.  [Tr. at 257, 260.]

On September 6, 2000, Dr. Ryan wrote that Salazar came in from jail "looking great.."  She was taking up to 150 mg of Serzone twice a day in jail.  [Tr. at 318.]

On September 27, 2000, Salazar presented at the hospital and had to be restrained and sedated.  [Tr. at 304.]  In mid-October, Dr. Ryan saw Salazar and said she was doing great and doing well.  [Tr. at 317.]

On October 26, 2000, a medical record indicates Salazar had self-inflicted wounds on her left forearm.  Alcohol was involved.  She stated she was depressed and had done this before.  [Tr. at 248.]  Five days later, Dr. Ryan stated that Salazar came in doing well.  She slashed her arms again but the incisions were fine.  She was receiving counseling from Amistad and was to return to see Dr. Ryan in one week.  [Tr. at 316.]

On November 2, 2000, there is a substance abuse evaluation from Amity, Inc. in Tucson.  The records states that Salazar was being evaluated for chemical dependency at her own request.  She was originally referred by Espanola Hospital.  Amistad lost contact with Salazar after she moved from

Velarde to Espanola.  She was in the Espanola jail over a month ago but denied being on probation.

Salazar recognized that she had a substance dependency issue that needed addressing and was there

for counseling upon her own request.  She stated she had been hospitalized six times during her life

for medical problems, including overdoses and asthma.  She had attempted suicide a week ago.  She

admitted to being intoxicated and cutting her left forearm that required 14 stitches.  [Tr. at 146.]  She

had a valid driver's licence and a car to use at this time.  Salazar stated she had trouble keeping her

job at Domino's because of alcohol and cocaine.  She first used marijuana at age 14 and had used

cocaine for 20 years.  She spent $150.00 on alcohol in the past thirty days.  She used Valium to sleep.

Salazar reported she had been charged with assault two times (convicted of one) and contempt of

court one time.  [Tr. at 148.]  She admitted she was under the influence when she committed the

assault.  Salazar stated she had three charges of disorderly conduct and one for public intoxication.

She had been incarcerated a total of two months.  Her grandfather, mother and aunt had problems

with alcohol and drugs.  Her father also had a problem with drugs and her two brothers had alcohol

problems.  Salazar reported having conflicts with her family and that she did not feel stable enough

to handle her own children.  [Tr. at 151.]  In the past thirty days, she felt seriously depressed, anxious,

and had trouble understanding and controlling her violent behavior.  She had thoughts of suicide and

had tried it more than five times but less than ten times.  She felt she had always experienced

depression and that she used alcohol or cocaine to self medicate.  [Tr. at 152.]  The interviewer found

her compliant and honest during the interview and stated that she was clearly depressed.

On November 7, 2000, Dr. Ryan saw Salazar and removed some stitches.  They talked at

length.  The record notes that he did not know of anything else they could do for her.  If she stayed

off the alcohol, she did pretty well.  [Tr. at 315.]

11

On December 4, 2000, John Lang of Wellness Clinical Services, Inc. wrote a report of a psychological evaluation he performed of Salazar. She was referred by the Amistad Drug Treatment Program that wanted a diagnosis, discussion of emotional conflicts and treatment recommendations. The usual history of cocaine abuse and multiple suicide gestures was noted. [Tr. at 358.] The report indicates that Salazar's mother died in an alcohol related car accident in 1995. The death of her ex-husband and mother occurring near the same time sent Salazar into a major depression, including suicidal ideation and PTSD. At this time, Salazar used rock cocaine, marijuana and alcohol. She also took methamphetamines and overdosed. Salazar stated she had been placed in local jails about ten times for detoxification. She was attending the Amistad Program for acupuncture, NA and AA meetings. She was also seeing counselors there. At the time, she was working at Domino's, had a car and a valid driver's licence. However, she was not taking medications. Her most recent suicide attempt was in October 2000 and she said she almost died. With respect to testing, she had average cognitive capabilities with no apparent memory, concentration or attention problems. She reported she self-medicated with drugs and alcohol, and that her longest "clean" period had been 96 days during 2000. She was trying very hard she said. She was given psychological testing but had trouble doing the tests and the results could not be scored. The testing showed she suffered from severe clinical depression but the results were unreliable because Salazar marked answers randomly at the end of the test. Her Axis I diagnosis was major depression, recurrent, severe with suicidal ideation; polysubstance dependence, cocaine dependence (in remission); Axis II - personality disorder NOS with symptoms of dependent and borderline; GAF - 50. She still was using cocaine at this time and stated she was too afraid to be an inpatient. She was referred for medications to a psychiatrist. [Tr. at 358-61.]

12

On December 18, 2000, Salazar was seen at the Health Centers and was discharged on January 23, 2001.  She was seen for the usual problems.  [Tr. at 154, 173, 245, 247, 166, 172.]  She was in jail part of the time.  On December 20, 2000, she was a no show at the Health Centers.  She was no longer in detention at this time.  [Tr. at 165.]  On December 23, 2000, she cut herself with pieces of a vase.  She was verbally abusive and verbalized a desire to die.  [Tr. at 234.]  She admitted to having been drinking.  One record notes that she had been taking Serzone but had quit because it was not working.  She reported suicidal thoughts when she was heavily intoxicated.  [Tr. at 160.]  On December 24, 2000, she signed another suicide prevention plan.  On December 28, 2000, she was no show at the Health Center.  [Tr. at 156.]

### 2001

On January 3, 2001, Dr. Ryan saw Salazar.  The slash on her arm was stapled and cleaned.  A January 22, 2001 record from Health Centers indicates that Salazar was non-compliant and that her case was closed.

Salazar claims that February 15, 2001 was the last day she could work.  On March 21, 2001, she filed for SSI benefits.  [Tr. at 97.]  On her disability report, she stated that she had emotional and mental illnesses that kept her from working, along with bipolar disorder and suicidal ideation.  She was taking Serzone and Lorazapam at this time.  [Tr. at 102.]

On March 24, 2001, Salazar jumped from a moving vehicle when she was under the influence of alcohol.  [Tr. at 215, 231.]  She fractured her humerus and ulna.  She stated that she had broken her arm during a rape.  [Tr. at 211, 215, 225, 227, 311, 206, 208, 310.]

On May 25, 2001, Dr. Ryan saw Salazar noting both that Julie was running from jail, and that she "looked well."  [Tr. at 364.]

13

On July 11, 2001, Salazar filled out a daily activities questionnaire.  She stated that she lived back and forth with family and friends, slept all day, and got up at about 5 p.m. to eat and watch TV. She felt she was in a deep depression. She did not prepare her own meals because she had no money. She ate at shelters.  She did not associate with people.  She had panic attacks out in public and anxiety due to a rape.  She hurt herself because of low self esteem.  Salazar said she had no hobbies and that her reading skills were low.  When she disagreed with someone, she felt suicidal and like cutting herself.  [Tr. at 119.]  Salazar reported that her husband had beaten her up for 10-15 years.

A psychiatric consultation for disability services was scheduled for September 18, 2001, but Salazar did not show up for the appointment.  [Tr. at 141.]  She later stated that she did not appear because she was very depressed, "out of it," and suicidal.  [Tr. at 141.]

On October 19, 2001, Salazar's underlying claim for SSI was denied.  The letter indicated that Salazar had been asked to go for a special exam that she did not attend.  Thus, the agency had to make a decision on the records in its possession, and those records indicated she was not disabled. [Tr. at 82.]

On November 29, 2001, Salazar was admitted to St. Vincent's for a suicide attempt.  At St. Vincent's they provided a diagnosis of Axis I: major depression, recurrent; polysubstance abuse in remission; PTSD in partial remission; Axis II-deferred; Axis III- old left arm fracture and asthma; Axis IV- moderate to severe stressors; Axis V - GAF 55, with 65 being her highest GAF in the past year.  At the time of discharge, she was sleeping and eating well.  Her depression was minimal.  She denied thoughts of harming herself or others.  Salazar was maintaining sobriety at this time and had been taking Serzone.  She was showing good judgment and insight.  As her hospital stay progressed,

14

Salazar became more hopeful, less depressed and the suicidality evaporated.  Her prognosis was "fairly good," if she stayed clean and sober.  [Tr. at 322, 324, 332.]

### 2002

There were no medical records supplied in 2002, although there are several disability related materials in the record.

On February 18, 2002, Salazar's father, Joe Jaramillo filled out a third-party questionnaire. He stated that Salazar slept, watched TV and sometime went out with friends and ended up drunk or in the hospital.  When Salazar went out, she drank excessively.  Her father described her as very depressed.  The only cooking Salazar might do was with a microwave.  She slept a lot and twitched. Salazar always needed reminders for appointments.  In her father's opinion, Salazar could not hold a job because of severe depression.  She inflicted pain on herself when under pressure, and this had been going on for fifteen years.  [Tr. at 126.]

On June 20, 2002, Salazar filled out a statement with a request for hearing stating that she had severe depression, was suicidal, had inflicted wounds on herself, was bipolar, manic and had PTSD. She had tried a lot of medications that did not help, and she could not afford them.  She stated that she cut or slashed herself both when sober and drunk, and that she had cut herself over 100 times. Salazar also stated she had been raped numerous times.  [Tr. at 130-34.]

### 2003

On January 3, 2003, Dr. Ryan noted that Salazar had a legitimate knee injury.  [Tr. at 363.]

On February 25, 2003, the ALJ held the administrative hearing in Santa Fe, at which Salazar was present with a non-attorney representative.  [Tr. at 44-79.]  Salazar testified that she did not believe she could do her prior work at Domino's because of depression and because she could not

stand on her legs long enough due to a bad knee.  At first, she seemed uncertain whether it was her

left or right knee and then finally said her bad knee was the right one.  [Tr. at 53.]  She claimed that

her knee problem was due to abuse by a husband.  She described her problems as being depression,

a broken leg, and two broken arms.  Salazar stated that her arm was still broken as she did not have

the money to have it fixed properly.  [Tr. at 54.]  She was taking anti-depression medication then.

[Tr. at 66.]

On April 13, 2003, the ALJ issued his decision denying benefits.  [Tr. at 24-34.]  The ALJ set

out a detailed summary of Salazar's medical history in 2000 and 2001, comparable to the Court's

summary above.  [Tr. at 25-28.]  With respect to the sequential analysis, the ALJ noted that he must

determine whether the impairments Salazar had demonstrated, including the effects of chronic

polysubstance abuse, met or equaled a listing.  The ALJ concluded that the documentary evidence

did support a finding that Salazar met the criteria of Listings § 12.09, as considered under § 12.04.

[Tr. at 29.]  Listing 12.04 requires a disturbance of mood, accompanied by a full or partial manic or

depressive syndrome.  The ALJ stated that her long history of chronic polysubstance abuse caused

Salazar to display almost every criteria of the applicable listing.  Salazar would be found disabled in

considering the combined effects of chronic polysubstance abuse alone.  [Tr. at 29.]

16

However, the ALJ proceeded to find that Salazar's chronic alcohol abuse was material to her disability and that without the effects of drug and alcohol abuse, she would not be found disabled. [Tr. at 30.]

The ALJ next considered Salazar's RFC in the absence of polysubstance abuse. He found that her emotional limitations historically were secondary to chronic abuse of multiple substances. Salazar herself reported that she could not maintain her job at Domino's because of her use of alcohol and cocaine. [Tr. at 30, 147.]

The ALJ also found that Salazar's long history of non-compliance with prescribed treatment interfered with her ability to perform work activity. She did not always take her medications and refused inpatient treatment. [Tr. at 30.] Salazar sometimes stated that she could not afford prescription drugs and yet could afford spending $150 a month on alcohol.

The ALJ concluded that in the absence of polysubstance abuse, Salazar's RFC was shown to have increased substantially. [Tr. at 30.] Thus, he found that the B Criterial of listing § 12.04 would not be met in the absence of Salazar's polysubstance abuse. [Tr. at 30.]

In reaching his determination of Salazar's RFC, the ALJ considered the record evidence and testimony about Salazar's broken limbs, her testimony about pain, medical opinions in the records, and Salazar's testimony about her severe depression, memory difficulties, and knee problems. He further explained why Salazar's subjective complaints and allegations of total disability were not well supported by the medical record and were not credible, particularly in light of the effects of her chronic polysubstance abuse. [Tr. at 31.]

In sum, the ALJ concluded that Salazar had the RFC to perform light exertional level work, excluding the effects of her drug and alcohol abuse. A pizza cook occupation was sedentary

exertional work as described by Salazar, and light work as described in the DOT.  Thus, the ALJ found that Salazar could return to her past relevant work.  [Tr. at 32.]

After the decision, there is one additional medical record.  On June 10, 2003, Salazar was prescribed an anticonvulsant medication that is used to prevent and treat seizures and other conditions.  [Tr. at 17.]  In the request for review, her representative stated that Salazar's last suicide gesture was on June 3, 2003.  [Tr. at 19.]

## Discussion

In this appeal, Salazar asserts the ALJ erred in finding that drug addiction and alcoholism were a contributing factor material to an otherwise favorable disability determination and further that substantial evidence does not support the ALJ's determination.  More specifically, Salazar argues that the ALJ erred in failing to consider her borderline personality disorder and PTSD,[12] in failing to obtain essential treating medical and mental health evidence, in failing to obtain a mental RFC assessment, in failing to follow required procedures in evaluating Salazar's mental impairments, and in failing to order a consultative physical examination.  The Commissioner claims that the ALJ properly determined that Salazar was not disabled because her drug addiction and alcoholism were a contributing factor material to the determination of disability, that substantial evidence supports the ALJ's decision and that the ALJ properly applied the correct legal standards.

_____

[12]PTSD is defined as the development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of an event that involves actual or threatened death or serious injury, or other threat to one's physical integrity.  American Psychiatric Ass'n Diagnostic and Statistical Manual of Mental Disorders at 424 (4th ed. 1994).

I.   **Drug Addiction and Alcoholism**

The Contract with America Advancement Act of 1996, Public L. No. 104-121, 110 Stat. 847, provides in part that "[a]n individual shall not be considered to be disabled for purposes of this subchapter if alcoholism or drug addiction would (but for this subparagraph) be a contributing factor material to the Commissioner's determination that the individual is disabled."   42 U.S.C. § 423(d)(2)(C).   "The ALJ must find plaintiff not disabled if alcoholism or drug addiction is a contributing factor material to his disability determination."   Bainer v. Barnhart, 2004 WL 2009426 at *3 (D. Kan. Aug. 19, 2004) (citing 42 U.S.C. § 423(d)(2)(C)).   The key inquiry is whether the plaintiff would still be disabled if she stopped using drugs or alcohol.   Id.; 20 C.F.R. § 404.1535(b)(1).   The ALJ determines which of plaintiff's limitations would remain if she stopped using drugs or alcohol.   Id.   If the ALJ decides that the plaintiff's remaining limitations would not be disabling, her drug addiction and/or alcoholism are then considered a contributing factor material to the disability determination.   Id.   However, if the plaintiff's remaining limitations are still disabling, her drug addiction and alcoholism are not a contributing factor material to the disability determination.   Id.   Under the latter scenario, the plaintiff then would be found disabled, independent of her addictions.   Id.

After the enactment of this law, the Social Security Administration set out a teletype on applying it.   The teletype stated in part that "when it is not possible to separate the mental restrictions and limitations imposed by [drug and alcohol abuse] and the various other mental disorders shown by the evidence, a finding of 'not material' would be appropriate."   "In other words, the agency directed that if the effects of a claimant's mental illness could not be separated from the effects of

19

substance abuse, the abuse would be found *not* to be a contributing factor material to the disability

determination." McGoffin v. Barnhart, 288 F.3d 1248, 1252-53 (10th Cir. 2002).

Clearly, if the claimant's only impairments are drug and alcohol related, the analysis might be

straight forward.  But, the analysis is more complicated where the plaintiff has other impairments in

addiction to drug and alcohol addictions.

> The most complicated and difficult determinations of materiality will
> involve individuals with documented substance use disorders and one
> of [sic] more other mental impairments.  In many of these instances,
> it will be very difficult to disentangle the restrictions and limitations
> imposed by the substance use disorder from those resulting from other
> mental impairment(s).

Stuart v. Barnhart, 2003 WL 1054014 at *3 (D. Kan. Feb. 24, 2003) (citing Cox, Dale, Social

Security Administration, Emergency Teletype, August 30, 1996)

> The most useful evidence [in analyzing such situations] must be given
> to the length of the period of abstinence, how recently it occurred, and
> whether there may have been any increase in the limitations and
> restrictions imposed by the other mental impairments since the last
> period of abstinence.

Id.

Here, the medical record clearly establishes that Salazar has polysubstance dependence and/or

addictions, namely to alcohol and cocaine, although the record indicates that she has used marijuana

for many years and has been an IV drug user.  In addition to the substance abuse, however, the

medical records provide diagnoses of mental disorders, including major depression, borderline

personality disorder and PTSD.

The ALJ in his written decision and during the administrative hearing considered both

Salazar's history of polysubstance abuse and her mental disorders. [Tr. at 24-34, 45.] He concluded,

20

however, that without the drug and alcohol abuse her severe medically determinable impairments did not meet or equal a listing and that but for the effects of her abuse, she had the RFC for light exertional work.  [Tr. at 33.]

Salazar contends that these findings were not supported by substantial evidence and were legally erroneous.  In addition, she claims that the ALJ erred in failing to discuss her diagnoses of Borderline Personality Disorder and PTSD in the written decision.

The Court disagrees and finds first that there was substantial evidence in the record to support the ALJ's findings that Salazar's polysubstance abuse was a factor material in the determination of her disability and/or that she would not be disabled but for the chronic polysubstance abuse.  [Tr. at 32-33.]  In addition, the Court concludes that the ALJ did not commit any error in reaching such a determination nor did he commit error in failing to discuss the diagnoses of Borderline Personality Disorder and PTSD.

The medical record, which was carefully discussed by the ALJ, is replete with references that alcohol and drug abuse were "factors material" in Salazar's self destructive behavior, suicide attempts and in her inability to hold a job.  One record states that Salazar failed to fulfill major role obligations at work and home because of alcohol abuse.  She herself admitted that drug and alcohol abuse affected her ability to hold a job.  [Tr. at 147, 158.] Salazar repeatedly ended up in the hospital with suicidal ideation or self inflicted cuts when she smelled of alcohol or was intoxicated.  On some occasions, she had overdosed and had to be restrained or sedated.  She reported suicidal thoughts when heavily intoxicated.  [136, 146, 154, 157, 158, 160, 188, 189, 190, 215, 231, 234, 245, 248, 254, 256, 260, 261, 262, 269, 275, 287, 290, 302, 304, 308.]  She was frequently in jail related to her alcohol or drug abuse and for detoxification.  [Tr. at 358.]

21

While Salazar testified that she cut herself when she was both drunk and sober [Tr. at 134], there is no objective medical evidence to support her contention that she cut herself when sober. Instead, the medical records consistently provide diagnoses and incidences related to chronic polysubstance abuse.  [Tr. at 143, 146, 154, 157, 166, 178, 188, 190, 198, 260, 262, 287, 290, 306, 308, 324, 358.]  For example, she jumped from a vehicle while using alcohol.  She was found by police walking on a highway in front of cars when using alcohol and drugs.  She was found crawling down streets after an acute drug and alcohol overdose.  [Tr. at 306.]  Salazar was described as being in a drug induced delirium.  [Tr. at 268.]  When Salazar appeared at the ER acting uncontrollably and combative (when under the influence), this was her "usual presentation."  [Tr. at 262.]  The urine toxicology screen, on that occasion, showed her "usual combination of benzodiazepines and cocaine."

Her health care providers and/or evaluators observed and noted a connection between her destructive behavior and substance abuse.  A counselor at Espanola clinic stated that he believed her suicidal gestures were due to alcohol and drugs.  [Tr. at 188.]  Health Centers personnel stated that her Salazar's history of erratic behavior, including suicide gestures were often secondary to substance abuse.  Her treating physician, Dr. Ryan, stated that if she stayed off alcohol, she did pretty well.  [Tr. at 315.]  St. Vincent's stated that if she stayed clean and sober, Salazar's prognosis was fairly good. [Tr. at 324.]

It is true that many of the medical records note Salazar's depression and history of depression. [Tr. at 122, 152, 158, 174, 190, 198, 287, 313, 314, 319, 324, 332, 358.]  Her father provided a statement that Salazar had been severely depressed and inflicted pain on herself when under pressure,

for as long as 15 years.  [Tr. at 126.]  Salazar stated that she felt she had always been depressed and used alcohol or cocaine to self medicate.  [Tr. at 152.]

The ALJ, in his written decision, considered all of the medical evidence and commented numerous times about Salazar's depression.  Similarly, at the hearing, he told Salazar he would consider any evidence of emotional problems she had to present.  The Court concludes here that the "record as a whole contains substantial evidence to support the Commissioner's decision" and that the correct legal standards were applied in determining that Salazar's polysubstance abuse was a factor material in determining her disability.  There is significantly more than "a mere scintilla of evidence" to support the ALJ's determination.

Moreover, a key factor in determining whether drug addiction and alcoholism are contributing factors material to the determination of disability is whether Salazar would have been disabled if she stopped using drugs or alcohol.  20 C.F.R. § 416.935(b)(1).  Here, the ALJ observed that when Salazar abstained from alcohol or drug abuse and/or followed treatment plans, she improved.  She was more hopeful, less depressed, and her suicidal ideation evaporated.  [Tr. at 324-26.]  If she stayed off alcohol, she did pretty well.  [Tr. at 315.]  Thus, when Salazar abstained from alcohol and drugs and was under treatment, her coping abilities and mental outlook improved.  Accordingly, this medical evidence, also discussed by the ALJ, provides additional support for the determination that drug addiction and alcohol were contributing factors material to his determination of non-disability in this case.

Salazar also argues that the ALJ erred in failing to discuss her diagnoses of borderline personality disorder and PTSD.  It is true that the ALJ's written decision does not mention these diagnoses.  Yet, the ALJ clearly reviewed the very records that contained these diagnoses because

23

his summary of the medical records was extremely thorough and discussed information from those records.  In addition, the references to borderline personality disorder and PTSD are sparse.  For example, the transcript references cited by Plaintiff include 8 pages of a 365 page administrative record.  Of those 8 pages, borderline personality disorder is diagnosed on only three records, with one additional record stating that Salazar had personality disorders with symptoms of borderline.  PTSD is mentioned on only two medical records.  None of these diagnoses appeared to have been made by Salazar's treating physician and some of the diagnoses are made without any comment whatsoever.  [Tr. at 200, 263.]  References to PTSD also contain little if any discussion and usually state that it was in partial remission.  [Tr. at 324, 334.]

The ALJ is not required to discuss every piece of evidence, nor every diagnosis that appears on a record.  *See* <u>Clifton v. Chater</u>, 79 F.3d 1007, 1009 (10th Cir. 1996).  Here, the ALJ stated in his opinion that he considered all of the medical evidence, and his discussion of the medical records is consistent with this statement.  Thus, the Court finds no error in the ALJ's failure to expressly discuss diagnoses of Borderline Personality Disorder and PTSD, when none of the pertinent medical records actually discuss a connection of those disorders with Salazar's self destructive behavior and/or ability to work.  Moreover, those records do not reflect any type of examination or testing that supported such diagnoses.

In this case, the ALJ did not find it impossible to disentangle the restrictions and limitations imposed by Salazar's substance use disorder from those resulting from other mental impairment(s).  Thus, the Court finds that the ALJ's decision denying benefits, for the reasons stated in his decision, are supported by substantial evidence and should be affirmed.

## II.   Failure to Develop Record and Consider Essential Treating Medical and Mental Health Evidence

The claimant bears the burden to prove disability in a social security case, and to meet this burden, the claimant must furnish medical and other evidence of the existence of the disability. Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  However, a social security disability hearing is nonadversarial, and the ALJ bears responsibility for ensuring that "an adequate record is developed during the disability hearing consistent with the issues raised."  Henrie v. United States Dep't of Health & Human Servs., 13 F.3d 359, 360-61 (10th Cir.1993).  "An ALJ has the duty to develop the record by obtaining pertinent, available medical records which come to his attention during the course of the hearing." Carter v. Chater, 73 F.3d 1019, 1022 (10th Cir.1996); *see also* §§ 20 C.F.R. 404.944, 416.1444 (requiring ALJ to look fully into issues);  Social Security Ruling 96-7p, 1996 WL 374186, at *2 n. 3 (requiring ALJ to develop "evidence regarding the possibility of a medically determinable mental impairment when the record contains information to suggest that such an impairment exists").

The ALJ's duty is heightened when the claimant proceeds *pro se*.  *See* Henrie, 13 F.3d at 361. Here, a non-attorney represented Salazar at the hearing. However, Salazar apparently does not challenge the qualifications of her representative. *See* Cowart v. Schweiker, 662 F.2d 731, 735 (11th Cir.1981) (stating that "the ALJ's 'basic obligation to develop a full and fair record rises to a special duty when an unrepresented claimant unfamiliar with hearing procedures appears before him' "); § 20 C.F.R.  416.1505 (providing that a claimant may be represented by an attorney or a qualified non-attorney).

Salazar asserts that the evidence demonstrates she received treatment from a number of providers whose reports are not in the record. She states that there were additional counseling records, medical reports from a psychiatric hospitalization from Las Vegas Medical Center, and treatment records from Dr. Franklin at Ayudantes, Inc. that were mentioned but not obtained. However, during the hearing before the ALJ, Salazar's representative did not indicate or suggest to the ALJ that any medical records were missing from the administrative record, nor did the representative ask for the ALJ's assistance in obtaining any additional medical records. Salazar does not state how these records would have made a difference, nor does she supply them to the Court. It also appears that Salazar did not provide these records to the Appeals' Council although her representative was granted more time in which to submit additional evidence. [Tr. at 11.]

The Court is not convinced that the ALJ needed to obtain any additional medical records in order to properly evaluate Salazar's mental impairments and/or drug and alcohol addictions. Salazar's medical history is amply documented in the medical records that are a part of the administrative record, and she makes no showing that anything of significance is missing from the current record. The Court, therefore, concludes that there was an adequate record by which the ALJ could decide this case, that substantial evidence supports his decision and that he did not commit any legal error.

## III.   Failure to Obtain a Mental RFC Assessment form a Treating or Examining Physician and Failure to Order Consultative Physical Examination

Salazar failed to attend a scheduled consultative psychiatric examination, during which a mental RFC assessment most likely would have been performed. A finding of "not disabled" may be made if a claimant, without good reason, fails or refuses to participate in a consultative examination.

26

*See* 20 C.F.R. §§ 404.1518, 416.918.  Here, the ALJ elected to proceed with a full analysis of the case despite Salazar's failure to attend the examination.  Moreover, her explanations for not attending, i.e., she was "out of it", very depressed and suicidal, are not supported by the objective medical evidence.  In other words, she does not appear to have been hospitalized at the time, nor are there treating physician records for this period.  In addition, there is no evidence in the record that Salazar ever attempted to request another consultative exam, either at the time or during the hearing.

The Court concludes that the ALJ had ample objective evidence in the record to make his determinations.  Thus, there was no need for an RFC Psychiatric Assessment in this case, particularly where there were several extensive medical or psychological evaluations in the record documenting Salazar's history and impairments.  [*See, e.g.,* Tr. at 146, 358.]

The Court also rejects Salazar's argument that the ALJ erred in failing to order a consultative physical exam regarding Salazar's broken left arm.  An ALJ "has broad latitude in ordering consultative examinations."  Hawkins v. Chater, 113 F.3d 1162, 1166 (10th Cir. 1997).  To require an examination, there must be "some objective evidence in the record suggesting the existence of a condition [that] could have a material impact on the disability decision."  Id. at 1167.  Based on the record before it, including medical records that show Salazar's arm was "healed" with some deformity and that her left elbow only "popped out" on occasion, the Court determines that the ALJ properly exercised his discretion in not ordering a consultative physical exam.

IV.     **Failure to Follow Required Procedures in Evaluating Salazar's Mental Impairments**

Salazar contends that the ALJ did not properly evaluate and document her mental impairments in accordance with 20 C.F.R. § 416.201a(a) and (e)(2).  Specifically, she asserts that the ALJ's decision contains no findings regarding whether there was a need for additional evidence and no effort

to rate the severity of Plaintiff's mental limitations in the areas of: activities of daily living; social functioning; concentration, persistence or pace; and episodes of decompensation.

Title 20 C.F.R. § 416.920a sets forth a special technique for rating the degree of the functional limitations that are caused by a mental impairment. The ALJ set forth the four areas that must be rated to determine the severity of Plaintiff's mental limitations. [Tr. at 29.] He further found that her long history of chronic polysubstance abuse caused her to display almost every criteria of the applicable listing, including marked restrictions of the activities of daily living, marked difficulties in social functioning, deficiencies of concentration and repeated episodes of deterioration. [Tr. at 29.]

However, based on a thorough examination of all the evidence and the record, the ALJ proceeded to find that in the absence of her polysubstance abuse, Salazar's impairments would not approach the requirements of the pertinent listings. Specifically, he concluded that in view of Salazar's substance abuse, the "B criteria" would be found to be only mildly restricted rather than markedly restricted. [Tr. at 30.]

The Court concludes that the ALJ properly analyzed Salazar's mental impairments under the special technique set forth under § 20 C.F.R. 416.920a. The ALJ listed the four broad areas that had to be met, how they were met when considering Salazar's polysubstance abuse, and how they were not met in the absence of that abuse. His decision also set forth a detailed history of Salazar's limitations and problems before reaching his decision regarding her mental impairment. Therefore, the Court finds that there was substantial evidence supporting the ALJ's analysis and that he did not commit error in his application of the pertinent regulations.

28

**V.      Whether Salazar's Depression Would Cause Only Minimal Limitations in the Absence of Polysubstance Abuse**

Salazar argues that there is not substantial evidence to support the ALJ's finding that she "would recover to a condition of only minimal limitation" if she stopped using drugs and alcohol.  The Court disagrees for the reasons stated above both under section I and in the recitation of Salazar's medical history.  The Court merely summarizes here that according to her medical care providers, each time Salazar accepted and continued treatment and abstained from the use of alcohol and drugs, she improved.  She no longer exhibited depression and no longer had suicidal ideation when clean and sober, and receiving medical treatment.  Moreover, again, Salazar herself reported that she had trouble maintaining employment because of her drug and alcohol use.

For these reasons, the Court concludes that there was substantial evidence supporting the ALJ's finding.

IT IS THEREFORE ORDERED THAT Plaintiff's Motion to Reverse or Remand Administrative Agency Decision [Doc. No. 11] is DENIED.

_____
Richard L. Puglisi
United States Magistrate Judge
(sitting by designation)

29